UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FAYE ROBYN O'NON,

        Petitioner,

                        Case No. 1:10-cv-841

v.

                        Hon. Robert J. Jonker

BARBARA SAMPSON,

        Respondent.

_____/

**REPORT AND RECOMMENDATION**

Petitioner, Faye Robyn O'Non (sometimes referred to as "Robyn O'Non") has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner is a former prisoner of the Michigan Department of Corrections (MDOC).[1]

## I.      Background

Petitioner was charged with perjury in a court proceeding involving a capital case, conspiracy to commit perjury, witness tampering and conspiracy to tamper with a witness. These charges arose from petitioner's actions prior to, and her testimony given during, the murder trial of her son, Matthew O'Non (sometimes referred to as "Matt" or "O'Non"). The jury convicted O'Non of murdering Manuel Longoria and Raul Ramirez on May 1, 2004, in the driveway of a rental cottage owned by petitioner and her husband, Nick O'Non. *See People v. Matthew Peter O'Non*, No. 263626, 2006 WL 373249 at *1 (Mich. App. Dec. 19, 2006).

---

[1] Petitioner filed this habeas action on August 24, 2010. Shortly thereafter, petitioner completed her sentence, being discharged from parole on September 3, 2010. *See* Answer at p. 1 (docket no. 11).

The Michigan Court of Appeals summarized the facts of O'Non's underlying murder case as follows:

> In a prior case, defendant's [i.e., petitioner's] son, Matthew O'Non, was convicted of two counts of first-degree murder for killing two men that he owed money to as a result of his involvement in the drug trafficking trade. According to trial testimony, O'Non and his girlfriend, Kristin Drow, were residing primarily at a cottage owned by defendant when the victims drove to the cottage to collect the debt and were shot by O'Non in their car. O'Non testified that the killings were in self-defense because one of the victims allegedly exited the vehicle and shot at him with a pistol, prompting him to return fire with an AK-47. Drow, however, testified that the murders were planned so that O'Non could avoid paying the debt, and that she did not hear any shots fired, other than O'Non's. Drow testified further that O'Non instructed her to tell the authorities that she had heard two smaller shots before a number of louder ones. After the murders, the victims' bodies were found wrapped in tarps and buried on the cottage property. Drow stated that O'Non had purchased tarps prior to the murders as part of the plan to dispose of the bodies.

*People v. Faye Robyn O'Non*, No. 280262, slip op. at p. 1 (Mich. App. Nov. 10, 2009) (docket no. 26).

The Michigan Court of Appeals summarized the underlying facts of petitioner's perjury conviction as follows:

> At O'Non's trial, defendant testified that she had instructed O'Non to purchase the tarps to help move woodchips around the cottage property, and that she had found a pistol shell casing, which she subsequently discarded, near the driveway where the victims' car had been parked.
>
> In the instant case, both defendant and O'Non asserted their Fifth Amendment right against self-incrimination and to remain silent. The transcripts of their testimony from O'Non's murder trial were read into the record. O'Non's testimony included his account of the killings and the circumstances surrounding and reason for his purchase of the tarps that were later used to enwrap the victims' bodies. Notably, his testimony was corroborated by and consistent with defendant's testimony that she had directed O'Non to purchase the tarps for yard work purposes. This account contradicted plaintiff's theory that the tarps were purchased in preparation for the killings.

*Id.* at pp. 1-2.  The witness tampering charge arose from petitioner's conversation with a witness, Justin Judd, while Judd was being held at the Maricopa County Jail in Arizona.  Trial Trans. III at pp. 106-24 (docket no. 22).

During petitioner's trial, the court dismissed the charge of conspiracy to commit perjury.  *See* Trial Trans. V at p. 11 (docket no. 24).  At the conclusion of the trial, the court instructed the jury on three charges:  Count I (perjury in a court proceeding involving a capital case); Count III (witness tampering); and Count IV (conspiracy to tamper with a witness).  Trial Trans. V at pp. 11, 70-76, 79, 88.  The jury convicted petitioner on Counts I and III, and found her not guilty on Count IV.  *Id.* at pp. 88-89.  On September 5, 2006, petitioner was sentenced to concurrent terms of 36 to 180 months for the perjury conviction and 14 to 48 months for the witness tampering conviction.  Sent. Trans. at pp. 10-15 (docket no. 25); *Faye Robyn O'Non*, No. 280262, slip op. at p. 1 (Nov. 10, 2009).

Petitioner, through counsel, filed a delayed application for leave to appeal to the Michigan Court of Appeals, which raised six issues:

I.      Was cross-examination of Matthew O'Non required in a perjury and obstruction of justice prosecution where the prosecution's primary theory was the link between Matthew O'Non's testimony and Robyn O'Non's testimony at Matthew O'Non's murder trial?

II.     Where (A) Count II, the conspiracy to commit perjury charge was dismissed for lack of independent proof, opening statement argument and evidence admitted pursuant to Count I destroyed [petitioner's] right to a fair trial on admissible evidence and (B) where the prosecutor's opening statement argument in regard to Counts III and IV contained statements the prosecutor knew he could not prove, was [petitioner] deprived of a fair trial on admissible evidence?

III.    Was there no evidence at preliminary examination to support eve of trial amendments to obstruction of justice charge from an improper

3

common law charge to an improper statutory charge under M.C.L. §
750.122(6)?

IV.    Where no rational juror could have found the elements of Counts I
and III beyond a reasonable doubt, was the evidence insufficient and
should the case be dismissed?

V.    Was testimony by witness Justin Judd as to what [petitioner] said
Matthew O'Non said clearly inadmissible and highly prejudicial?

VI.    From the search of the yard at the Putnam Road cottage, does
impermissible evidence of burial of four lbs. of marijuana and burned
letters of the dead men in a fire pit, neither of which had any
connection to [petitioner], require a new trial?

Corrected supplemental application for leave to appeal (docket no. 26).  The application was denied.

*See People v. Faye Robyn O'Non*, No. 280262 (April 4, 2008) (docket no. 26).

Petitioner filed an application for leave to appeal to the Michigan Supreme Court

raising the same six issues.  Application for leave to appeal (docket no. 27).   In an order entered on

April 8, 2009, the Michigan Supreme Court, in lieu of granting leave to appeal, remanded the case

to the Michigan Court of Appeals for consideration of the following issues:

(1) whether the redacted transcript of the prior testimony of Matthew O'Non at his
own trial, which was admitted in this case, was "testimonial" under *Crawford v.
Washington*, 541 U.S. 36; 124 S Ct 1354; 158 L Ed 2d 177 (2004); (2) whether any
statements in that transcript were hearsay under MRE 801(c) because they were
offered to prove the truth of the matters asserted and therefore were barred by
*Crawford*; and (3) whether all statements in that transcript that were offered to prove
the falsity of the matters asserted necessarily were not hearsay under MRE 801(c)
and thus were not barred by *Crawford*.

*People v. Faye Robyn O'Non*, No. 136514 (Mich. April 8, 2009) (docket no. 27).  The application

for leave to appeal was denied "[i]n all other respects."  *Id.*  The Michigan Court of Appeals

affirmed on remand.  *Faye Robyn O'Non*, no. 280262 (Nov. 10, 2009).

Petitioner then filed an application for leave to appeal to the Michigan Supreme Court raising one issue:

I.      Was cross-examination of Matthew O'Non required in a perjury and obstruction of justice prosecution where the prosecution's primary theory was the link between Matthew O'Non's testimony and Robyn O'Non's testimony at Matthew O'Non's murder trial.

Application for leave to appeal (docket no. 28).   The Michigan Supreme Court denied the application because it was not persuaded that the question presented should be reviewed by the court. *Faye Robyn O'Non*, No. 140305 (Mich. March 29, 2010) (docket no. 28).

Petitioner, through counsel, filed the present habeas action, which raised five issues in the amended petition:

I.      Cross-examination of Matthew O'Non was required in a perjury and obstruction of justice prosecution where the prosecution's primary theory was the link between Matthew O'Non's testimony and Robyn O'Non's testimony at Matthew O'Non's murder trial.

II.     Admissible evidence [sic] and (B) where the prosecutor's opening statement argument in regard to Counts III and IV contained statements the prosecutor knew he could not prove, [petitioner] was deprived of a fair trial on admissible evidence.

III.    Where no rational juror could have found the elements of Counts I and III beyond a reasonable doubt, the evidence was insufficient and the case must be dismissed.

IV.     Testimony by witness Judd as to what Robyn O'Non said Matthew O'Non said was clearly inadmissible and highly prejudicial.

V.      From the search of the yard at the Putnam Road cottage, impermissible evidence of burial of four lbs. of marijuana and burned letters of the dead men in a fire pit, neither of which had any connection to [petitioner], requires a new trial.

Amend. Pet. (docket no. 5).

5

## II.        Standard of review under 28 U.S.C. § 2254

Petitioner seeks relief under 28 U.S.C. §2254, which provides that "a district judge shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  Before petitioner may seek such relief in federal court, she must first fairly present the substance of her claims to all available state courts, thereby exhausting all state remedies. *Picard v. Connor*, 404 U.S. 270, 277-78 (1981); *Clemmons v. Sowders*, 34 F.3d 352, 354 (6th Cir. 1994); *see* 28 U.S.C. §2254(b)(1)(A).  In the present case, petitioner has exhausted her state remedies with respect to her habeas claims.

Where the state court has adjudicated a claim on its merits, the federal district court's habeas corpus review is limited by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which provides in pertinent part that:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication–

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA "imposes a highly deferential standard for evaluating state-court rulings, and  demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*,  559 U.S. 776,  130 S. Ct. 1855, 1862 (2010) (internal quotation marks and citations omitted).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists

6

could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, -- U.S.--, 131 S. Ct. 770, 786 (2011). The AEDPA's deferential standard "requires Petitioner to show 'the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing [Supreme Court precedent] beyond any possibility for fairminded disagreement.'" *Blackmon v. Booker*, 696 F.3d 536, 538 (6th Cir. 2012), quoting *Harrington*, 131 S. Ct. at 786-87. "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington*, 131 S. Ct. at 786. "If this standard is difficult to meet, that is because it was meant to be." *Id.*

> Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Id.* at 786-87 (internal citations omitted).

Under the "contrary to" clause of § 2254(d)(1), "a federal habeas court may grant the writ only if the state court arrived at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decided the case differently than the Supreme Court has on a set of materially indistinguishable facts." *Jalowiec v. Bradshaw*, 657 F.3d 293, 301 (6th Cir. 2011), citing *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). Under the "unreasonable application" clause of § 2254(d)(1), "a federal court may grant the writ only if the state court identified the correct governing legal principle from the Supreme Court's decisions but unreasonably applied that principle to the facts of the petitioner's case." *Id*. A court may not issue a writ of habeas corpus "simply because that court concludes in its independent judgment that the relevant

state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411. Rather, to grant habeas relief, the state court's application of the law must be found to be "objectively unreasonable." *Id.* at 409.

A determination of a factual issue by a state court is presumed to be correct. 28 U.S.C. § 2254(e)(1). A habeas petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence that the state court's determination was erroneous. *Magana v. Hofbauer*, 263 F.3d 542, 546-47 (6th Cir. 2001). The presumption of correctness accorded to a state court's findings of fact on federal habeas review also applies to the factual findings of a state appellate court based on the state trial record. *Brumley v. Winegard*, 269 F.3d 629 (6th Cir. 2001).

### III.    Discussion

### A.    Cross-examination of Matthew O'Non

Matthew O'Non did not testify at petitioner's perjury trial, claiming his right to remain silent under the Fifth Amendment. The trial court, however, allowed some of O'Non's testimony given at his previous murder trial to be presented at petitioner's trial. Petitioner contends that the trial court deprived her of the right to cross-examine Matthew O'Non when the court admitted O'Non's testimony from the murder trial. Petitioner contends that "[t]he trial court's ruling misses the constitutionally required point: to the extent Matthew O'Non's testimony is not worthy of belief, cross-examination of Matthew O'Non would have had enormous utility for Robyn O'Non." Amend. Pet at p. 25. While petitioner refers to a "constitutional required point" related to Matthew O'Non's testimony, she cites no authority in support of her position.

The trial court addressed Matthew O'Non's testimony as follows:

There were some preliminary matters we needed to cover this morning.

The first relates to the proposed testimony of Matthew O'Non; the Court did review that again over the weekend.  The objections have been consistently those based on hearsay and an application of Crawford [i.e., *Crawford v. Washington*, 541 U.S. 36 (2004)].   As the Court has reviewed the redacted portion of the testimony that's proposed to be offered, the Court believes this testimony can be received because it is not offered for the truth of the matter asserted.  The making of the statements, the Court believes are relevant with respect to the claim of perjury because they are not offered for their truth.  Indeed, it would appear based on the jury's findings in the underlying case that Matthew O'Non's testimony, at least as it's redacted here, was false.

With regard to the Crawford issue, there are two points.  It does appear that Matthew O'Non was here, potentially available for examination and cross-examination.  He asserted a Fifth Amendment privilege, which the Court believed had no foundation given he had already testified regarding all these matters, has already been federally prosecuted, already reached his plea deal with the federal government and would not appear to have any further criminal exposure arising out of these transactions; however, the Court didn't go through this useless exercise finding him in contempt since he's already in prison for the rest of his life without parole and it wasn't a viable sanction.

Additionally, the court believes this matter is received not for the truth of the matter asserted but because the statements were made.  There would be a serious issue as to whether or not this even rises to the level of testimonial statement covered by Crawford.  So, for both of those reasons it appears to be none [sic] testimonial and Mr. O'Non was here and his Fifth Amendment assertion was without legal foundation, the Court would allow the redacted portion to be read into the record.

The Court is deliberately not admitting this testimony for any suggestion that it's true under [MRE] 801 because the Court believes from the outline of the testimony provided to it in a conference with counsel in chambers there will not be sufficient evidence to go to the jury on the conspiracy to commit perjury charge.  And, therefore, to keep the record as clear and clean as possible the Court – and, because the Court finds nothing in the offer that would appear to be true not making a ruling in favor of the People under [MRE] 801 [sic].

Trial Trans. IV at pp. 3-5 (docket no. 23).

During closing argument, the trial court instructed the jury on how to view the evidence presented at Matthew O'Non's underlying murder trial in the context of petitioner's trial for perjury, witness tampering and conspiracy to tamper with a witness:

9

Members of the jury, there is clearly an interplay between the underlying murder trial and this trial. The charges, as you've learned, are claims of perjury and witness tampering, conspiracy to tamper with a witness. The Court has made it clear in the pretrial rulings that this trial was not to be a complete retrial of the underlying case. You didn't hear all the witnesses that were in the underlying case, they weren't material to what you need to decide here, in the Court's view.

With regard to the two rulings the Court has made, that the gun [used by Matthew O'Non to commit the murders] was purchased at the same time as ropes, tarps and ammunition, it's the Court's ruling that there is no evidence in this case that the gun was purchased the same day. It may be that Matthew O'Non said that in his trial, but the Court received his trial transcript not for the truth of the matters asserted but because he made those statements, a number of statements that are being argued to you here today and they aren't claimed to be true, they are claimed, if the Court understood from the pleadings, to be false. The only evidence of when the gun was purchased isn't in this case and I'm not going to discuss that with you. But, there was other evidence of when the gun was purchased on a different day and we aren't going to go through that, that's why the Court is telling the prosecutor that he can't make the comment that the gun was purchased the same day, there is no evidence of that. With regard to the statement about [law enforcement officers] searching the trash, there is evidence in this record, if you choose to believe it, regarding an exhaustive search of the area. If you wish to draw some inference from that or he [the prosecutor] wishes to argue some inference from that, that would be fair in view of testimony that there were photographs taken and then testimony that there was a mistake about the taking of photographs. I'm not going to allow an argument about any particularized search of any particular trash can.

So that's where we are, I'm limiting the argument in that regard and you can proceed with that understanding.

Trial Trans. V at pp. 29-31.

On remand from the Michigan Supreme Court, the Michigan Court of Appeals addressed whether Matthew O'Non's testimony should have been admitted and whether petitioner had a right of cross-examination in a lengthy opinion which is set forth in pertinent part below:

Defendant maintains that O'Non's statements were testimonial and wrongly admitted based on *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) and that her Sixth Amendment right to confront O'Non was violated. Constitutional questions regarding a defendant's right of confrontation are reviewed de novo. *People v. Beasley*, 239 Mich.App. 548, 557, 609 N.W.2d 581 (2000).

10

The Supreme Court has directed us to first consider whether the transcript of O'Non's prior testimony was "testimonial" under *Crawford*. *Crawford*, *supra* at 51-52, 58. The *Crawford* Court provided the following guidance in determining which statements are testimonial:

> Various formulations of this core class of "testimonial" statements exist: "*ex parte* in-court testimony or its functional equivalent - that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially," . . .; "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions,"; "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," . . . . These formulations all share a common nucleus and then define the Clause's coverage at various levels of abstraction around it. Regardless of the precise articulation, some statements qualify under any definition - for example, *ex parte* testimony at a preliminary hearing. [*Id.* at 51-52 (citations omitted).]

The *Crawford* Court did not provide an exhaustive class of statements that would constitute testimonial hearsay, and instead stated:

> We leave for another day any effort to spell out a comprehensive definition of "testimonial." Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations. These are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed. [*Id.* at 68.]

Accordingly, under *Crawford*, O'Non's "prior testimony. . . at a former trial" was clearly "testimonial."

Nonetheless, as further directed by our Supreme Court, we must consider whether any statements within O'Non's prior testimony were offered to prove the truth of the matters asserted and therefore barred by *Crawford*. The *Crawford* Court explained that "[t]he [Confrontation] Clause does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Crawford*, *supra* at 59 n. 9, citing *Tennessee v. Street*, 471 U.S. 409, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985). As our Court has explained:

11

In *Street*, the defendant testified in his own defense, and claimed that his confession was coerced and derived from an accomplice's testimony. *Street*, *supra* at 411. The prosecution successfully moved for the admission of the accomplice's testimony at trial. *Id.* The defendant argued that his Confrontation Clause right had been violated because he had not had the opportunity to cross-examine the accomplice. However, the Court held that the accomplice's confession did not violate the Confrontation Clause because it was admissible for the limited purpose of allowing the jury to compare it to the defendant's confession to see whether the defendant's claim that his confession was coerced or derived from the accomplice's testimony was true. *Id.* at 413-414. [*People v. McPherson*, 263 Mich.App. 124, 133, 687 N.W.2d 370 (2004).]

This Court has also recognized that the Confrontation Clause does not bar the use of out-of-court testimonial statements for purposes other than establishing the truth of the matter asserted. *See People v. Chambers*, 277 Mich.App. 1, 10-11, 742 N.W.2d 610 (2007); *McPherson, supra* at 133-134, 687 N.W.2d 370. In *Chambers*, *supra* at 2, 742 N.W.2d 610, the defendant argued that information given by a nontestifying confidential informant to the police that was elicited and admitted into evidence at trial violated his rights under the Confrontation Clause. This Court held that, even though statements to authorities generally constitute testimonial statements, a statement offered to show the effect of the out-of-court statement on the listener, not the truth of the matter asserted, does not violate the Confrontation Clause. *Id.* at 10-11, 742 N.W.2d 610. And, similarly, in *McPherson*, *supra* at 132-134, 687 N.W.2d 370, this Court upheld a ruling that the admission of the statement of a deceased accomplice to the police that was "undeniably testimonial in nature" did not violate the Confrontation Clause. This Court reasoned that the statement was admissible because it was not introduced for its substance, to identify the defendant as the shooter, but rather to show that the defendant was aware of the accomplice's statement in light of the defendant's testimony that the accomplice was the shooter, and as part of the prosecutor's theory that defendant changed his story several times and could not be believed. *Id.* at 133-134, 687 N.W.2d 370. [FN1]

Here, as well, plaintiff certainly did not offer O'Non's prior testimony about why he purchased the tarps to prove that this account was true. To the contrary, plaintiff argued that O'Non's testimony was false and a part of his implausible self-defense theory, which a jury had already rejected. The circuit court so ruled on a pre-trial motion, stating that O'Non's prior statements were not offered for their truth and were not subject to the *Crawford* analysis. During the trial, the circuit court affirmed its ruling:

> As the court has reviewed the redacted portion of the testimony that's proposed to be offered, the court believes this

testimony can be received because it is not offered for the truth of the matter asserted. The making of the statements, the court believes are relevant with respect to the claim of perjury because they are not offered for their truth. Indeed, it would appear based on the jury's findings in the underlying case that Matthew O'Non's testimony, at least as it's redacted here, was false.

\* \* \*

[T]he court believes this matter is received not for the truth of the matter asserted but because the statements were made.

And, during closing arguments, the trial judge informed the jury of the limitations of this evidence as follows:

The court received [O'Non's] trial transcript not for the truth of the matters asserted but because he made those statements, a number of statements that are being argued to you here today and they aren't claimed to be true, they are claimed, if the court understood from the pleadings, to be false.

There was no error here. O'Non's testimony as to the reason he purchased the tarps was not offered for its truth. It was not offered as evidence of what had actually occurred before and during the killings. To the contrary, it was offered to show the farfetched nature of O'Non's account, and how defendant's testimony dovetailed precisely with that account. It thus provided a context by which defendant's statements could reasonably be adjudged by the fact-finder to be perjurious. O'Non's testimony tended to show the falsity of defendant's testimony, not its own truthfulness. Because the statements were not offered for their truth, they were not inadmissible hearsay, and there was no violation of defendant's right of confrontation.

Plaintiff also sought to admit evidence of when O'Non purchased the tarps for its truth. However, admission for this purpose was denied. Plaintiff then argued that the tarps were purchased at the same time as the gun and ammunition to show that they were purchased as part of a plan to murder, rather than to move woodchips as defendant said that she requested. Arguably, from O'Non's testimony that he purchased the ammunition and the tarps at the same time, the jury could have made an inference that he was purchasing them for the murders rather than for defendant. If the jury believed the truth of that portion of O'Non's testimony, then it could have inferred that defendant was lying when she testified that she asked O'Non to purchase the tarps to help haul woodchips. However, the court was clear to the jury that none of the testimony from the transcript was to be admitted as true. If evidence is admissible for one purpose, but not others, the trial court must give a limiting

13

instruction upon request.  MRE 105; *People v. Basinger*, 203 Mich.App. 603, 606, 513 N.W.2d 828 (1994).  Jurors are presumed to follow the instructions of the judge. *People v. Graves*, 458 Mich. 476, 486, 581 N.W.2d 229 (1998); *People v. Mette*, 243 Mich.App. 318, 330-331, 621 N.W.2d 713 (2000).  To the extent that introduction of O'Non's account of when he purchased the tarps might possibly have been minimally violative of the Confrontation Clause, it would not have prejudiced defendant in any manner that would operate as a ground for a new trial.  *People v. Pickens*, 446 Mich. 298, 313, 521 N.W.2d 797 (1994).

We affirm.

> [FN1.  These precedents suffice to answer a third question directed to us by the Supreme Court, whether statements in the  O'Non transcript offered to prove the falsity of the matters asserted were barred by the Confrontation Clause.  As stated in *Crawford*, and as applied in *McPherson* and *Chambers*, the Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Crawford*, *supra* at 59 n. 9.  Thus, using O'Non's statements to show that they were false and thus to help prove that defendant's consistent statements were perjurious did not implicate the Clause.  In this regard, we note that defendant's argument that the prosecutor used O'Non's statement to prove the truth of plaintiff's theory that defendant committed perjury misses the point.  What is relevant to the inquiry here is "the truth of the matter asserted," i.e., the truth of O'Non's statement, not the truth of the theory advanced by plaintiff to convict defendant.  Statements that are relevant to an ultimate issue may still be nonhearsay unless they are offered for the truth of the matter asserted.  MRE 801(c); *People v. Eady*, 409 Mich. 356, 361, 294 N.W.2d 202 (1980); *Guerrero v. Smith*, 280 Mich.App. 647, 660-661, 761 N.W.2d 723 (2008).]

*Faye Robyn O'Non*, No. 280262, slip op. at pp. 2-5 (Nov. 10, 2009).

As discussed in detail by both the trial court and the Michigan Court of Appeals, Matthew O'Non's prior trial testimony was not offered to establish the truth of the matters asserted. Rather, it was offered to demonstrate how petitioner's testimony regarding the tarps and the discovery of the pistol shell casing dovetailed with O'Non's self-defense theory, i.e., that he purchased the tarps for lawn use and that he acted in self-defense after the victims fired at him from the driveway.  Under the facts and law as laid out by both the trial court and the Michigan Court of

14

Appeals, the Court agrees that petitioner was not deprived of a constitutional right to cross-examine Matthew O'Non. Petitioner has failed to demonstrate that the state courts' ruling on "was so lacking in justification that there was an error well understood and comprehended in existing [Supreme Court precedent] beyond any possibility for fairminded disagreement.'" *Blackmon*, 696 F.3d at 538, quoting *Harrington*, 131 S. Ct. at 786-87.

The Michigan Court of Appeals' decision was neither contrary to, nor an unreasonable application of, clearly established Federal law as determined by the Supreme Court; nor was the decision based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254 (d). Accordingly, petitioner is not entitled to relief on this claim.

### B.    Prosecutorial misconduct

Petitioner contends that the prosecutor committed misconduct in his opening statement, when he anticipated introducing evidence relating to an agreement between petitioner and Kristin Drow to give false testimony in support of Matthew O'Non's self defense claim. According to petitioner, the prosecutor knew that he could not prove such an agreement and that the prosecutor deprived petitioner of a fair trial when he mentioned the facts related to the alleged agreement. Petitioner contends that she suffered "enormous prejudice" when the prosecutor stated in opening argument that there was an "intentional deal" between petitioner and Kristin Drow to support Matthew O'Non's testimony and that petitioner conspired with O'Non and Drow with knowledge of what Drow was going to say at trial. Amend. Pet. at p. 27. Petitioner further contends that "[t]he prosecutor was able to improperly tell the jury there was proof of an agreement between Kristin Drow and Robyn O'Non to give false testimony in support of Matthew O'Non's self-defense claim"

15

and that "[t]his statement goes to the very essence of every count in this case." *Id.* at p. 35.

Petitioner, however, provides no legal authority to support her claim of prosecutorial misconduct.

During the opening statement, the prosecutor referred to evidence which the government would produce to show that petitioner and Kristin Drow conspired to support O'Non's self-defense theory. The prosecutor's statement is as follows:

> I'm going to introduce to you [petitioner's] testimony so you can look through it and you can see how it dovetails with what Kristin [Drow] was supposed to say and with what Matthew O'Non did say. And I'm going to ask you when you look at it to determine whether or not that is not [sic] clearly an intentional deal to support his [Matthew O'Non's] testimony.

Trial Trans. II at p. 27 (docket no. 20).

During a later portion of the statement, the prosecutor explained how he intended to prove the alleged conspiracy:

> I think when you examine [petitioner's] testimony and when you hear the physical evidence that established this self-defense claim as hooey if you will, that you're going to see her testimony was designed to support that, that the whole purpose of it was to establish that, that it was an absolute utter lie and that [petitioner] committed the crime of perjury and she conspired to do that with Matt and Kristin Drow, not by sitting there and talking to them and saying this is what I'm going to do, this is what you're going to do [sic]. How is the conspiracy established if there is not knowledge of what Matt's going to say, it makes no sense what she says, if there is no knowledge of what Kristin Drow says, there is no sense to what she said, the third leg of the stool of false fraudulent claim of self-defense was Kristin Drow. You had Matt's lies, you had Kristin Drow's lies and you had [petitioner's] lies. When Kristin Drow's leg of that stool was kicked out then it became immediate and obvious to the fact finder that this was -- that it was not sensible. But understand [petitioner] took the stand, Mrs. O'Non did, before Kristin Drow determined during the course of the trial that she was going to testify on behalf of the prosecution, which she did. And she will be here, she's currently serving a prison sentence for her role in the course of this. Folks, this isn't about helping somebody by paying to an attorney, this isn't about, no, my son's not here and they are looking at him for throwing eggs at a car, this is about trying to get away with murder.

*Id.* at 31-32.

16

Petitioner's counsel moved for a mistrial with respect to the opening statement, stating in pertinent part:

> Grounds for mistrial would be inappropriate [sic] and prosecutorial misconduct conducted in the opening of the case. They told the jury they were going to produce evidence they did not produce. They did so in the areas of conversations allegedly they said took place between [petitioner] and Kristin Drow, actually an agreement that never took place, they presented that to the jury in opening statements. They also said they were going to produce evidence of some kind of a family meeting that didn't -- they were unable to get that evidence into this case.

Trial Trans. IV at p. 20.

The trial court denied petitioner's motion for a mistrial, stating in pertinent part:

> Dealing first with the issue of a mistrial. Succinctly stated the Court understands that motion to be directed at ostensible prosecutorial misconduct due to references made in an opening statement to circumstances or evidence that were not received during the course of the trial.

> *       *       *

> The Court has looked to a succinct source for the standard relating to mistrial that should apply in this particular case and has relied on that described in Volume Two of Gillespie at Section 719, Page 657. In summary, arguments and statements should not be held prejudicial if made in good faith and then fairly construed do not appear to influence the jury adversely concerning the rights of the accused. Alternatively, was defendant denied a fair trial and impartial trial. Was the jury cautioned about the questions and statements and arguments of counsel. The Court believes that the jury was cautioned extensively during voir dire and again during the preliminary instructions regarding statements, arguments of counsel, the need to hold the People to their burden of proof and to protect the defendant's presumption of innocence and they will be cautioned again in the final instructions.

> Alternatively, did the prosecutor act in bad faith. The Court cannot conclude that the prosecutor acted in bad faith. The areas of proof that were excluded by the Court were not frivolous and do indeed present legitimate issues for appeal. For example, Ms. Drow did testify that she was at Matt's parents [sic] home on Sunday the 16th; the Court, however, would not allow her to offer statements from Matt regarding conversation at the home. Ms. Drow testified to being present in a meeting in Mr. Elhart's office, where this defendant was present for purposes of discussing her proposed testimony; and, the Court would not allow her to repeat Mr. Elhart's

17

statements. [ [2] ] Mr. Elhart, in Ms. Drow's testimony, told her what he understood her testimony to be and she agreed. Mr. Elhart in a proceeding out of the jury's presence indicated Ms. Drow [sic] said what her testimony would be, he didn't know it in advance. The Court found that Mr. Elhart's repetition of the words did not have independent relevance unless it was for the truth of a story to be provided and therefore sustained hearsay objections; that is subject to a legitimate question that may well be raised on appeal, and certainly the Court would be guided in the future by whatever that ruling may be.

One might have argued that it didn't matter who initiated the conversations if the words were the same, whether it was Ms. Drow or Mr. Elhart, that's not a matter which we approached. But, clearly there were legitimate differences of opinion with regard to rules of evidence there. The Court's rulings were on evidentiary findings and not based on frivolous arguments. The Court doesn't believe there was bad faith shown by the prosecutor and believes in the context of the opening statements and the cautionary instructions already provided to the jury that there has not been a denial of due process and that the defendant has not been denied a fair and impartial trial due to any comments at this point made by the prosecutor.

Trial Trans. IV at pp. 34-37.

The court considers the prosecutor's remarks within the context of the entire trial to determine whether any improper remarks resulted in prejudicial error. *Cristini v. McKee*, 526 F.3d 888, 901 (6th Cir. 2008). "Prosecutors can argue the record, highlight any inconsistencies or inadequacies of the defense, and forcefully assert reasonable inferences from the evidence." *Id.* However, prosecutors cannot offer their opinions as to credibility of a witness or the guilt of a defendant, or discuss any purported facts not introduced into evidence. *Id.* Nevertheless, even if the prosecutor's conduct was improper or even universally condemned, the court can provide federal habeas corpus relief only if the statements were so flagrant and egregious as to deny the petitioner a fundamentally fair trial. *Donnelly v. DeChristoforo*, 416 U.S. 637, 643-45 (1974); *Bowling v.*

---

[2] Mr. Elhart was Matthew O'Non's defense counsel during his murder trial. *See* Trial Trans. III at p. 128 (docket no. 22).

18

*Parker*, 344 F.3d 487, 512 (6th Cir. 2003); *Hutchison v. Bell*, 303 F.3d 720, 750 (6th Cir. 2002).

"The relevant question is whether the prosecutor's comments so infected the trial with unfairness

as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168,

181 (1986) (citation and internal quotations omitted).

"When a petitioner makes a claim of prosecutorial misconduct, 'the touchstone of due

process analysis . . . is the fairness of the trial, not the culpability of the prosecutor.'" *Serra v.

Michigan Department of Corrections*, 4 F.3d 1348, 1355 (6th Cir.1993) (*quoting Smith v. Phillips*,

455 U.S. 209, 219 (1982)).  The court should consider four factors in determining whether a

prosecutor's improper remarks are so flagrant as to rise to the level of a due process violation: (1)

the likelihood that the prosecutor's remarks tended to mislead the jury or to prejudice the accused;

(2) whether the remarks were isolated or extensive; (3) whether the remarks were accidentally or

deliberately placed before the jury; and (4) the total strength of the evidence against the accused.

*Bates v. Bell*, 402 F.3d 635, 641 (6th Cir. 2005)

In his opening statement, the prosecutor made a brief reference to an "intentional

deal" between petitioner and Drow to provide evidence in support O'Non's self-defense theory.

While the prosecutor mentioned this "intentional deal," he did not state exactly how he intended to

prove the existence of this deal.  In denying petitioner's motion for a mistrial, the trial court noted

that it had excluded evidence which the prosecutor attempted to introduce in support of this

purported deal between petitioner and Drow. The fact that the prosecutor was unsuccessful in his

attempts to admit evidence of the alleged conspiracy did not make his statements about the proposed

evidence improper.  As the Supreme Court stated in *Frazier v. Cupp*, 394 U.S. 731 (1969):

> Many things might happen during the course of the trial which would prevent the
> presentation of all the evidence described in advance. Certainly not every variance

> between the advance description and the actual presentation constitutes reversible error, when a proper limiting instruction has been given.  .  .  At least where the anticipated, and unproduced, evidence is not touted to the jury as a crucial part of the prosecution's case, it is hard for us to imagine that the minds of the jurors would be so influenced by such incidental statements during this long trial that they would not appraise the evidence objectively and dispassionately.

*Frazier*, 394 U.S. at 736 (internal quotation marks omitted).  Here, while the prosecutor briefly referred the purported deal between petitioner and Drow, he did not tout any particular anticipated evidence to the jury (i.e., the evidence of prior meetings between petitioner and Drow) as a crucial part of the prosecution's case.

Furthermore, assuming, *arguendo,* that the prosecutor's remarks were improper, the remarks were not so flagrant as to rise to the level of prosecutorial misconduct when reviewed under the four factors listed in *Bates*.  In considering the first and second factors, while the prosecutor's reference to an "intentional deal" between petitioner and Drow was deliberately placed before the jury, it was an isolated comment.  With respect to the third factor, this comment did not tend to mislead the jury or prejudice petitioner because the charge of conspiracy to commit perjury was dismissed by the trial court and never considered by the jury.  Finally, with respect to the fourth factor, the total strength of the evidence against petitioner, the Court concludes that such evidence was sufficient for the jury to convict petitioner on the charge of witness tampering.  The Court need not reach this issue as to the charge of perjury.  *See* discussion in § III.C., *infra*.

The state court's decision was neither contrary to, nor an unreasonable application of, clearly established Federal law as determined by the Supreme Court; nor was the decision based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254 (d).  Accordingly, petitioner is not entitled to relief on this claim.

20

### C.     Insufficient evidence

Petitioner contends that there was insufficient evidence to support her convictions for perjury and witness tampering.  In *In re Winship*, 397 U.S. 358 (1970), the Supreme Court held that Fourteenth Amendment's Due Process Clause protects a criminal defendant against conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  *In re Winship*, 397 U.S. at 364.  Under *Jackson v. Virginia*, 443 U.S. 307 (1979), sufficient evidence supports a conviction if "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Id.* at 319 (emphasis added).  In determining whether sufficient evidence exists to support a conviction, the reviewing court must presume that the trier of fact resolved conflicting inferences of fact in favor of the prosecution, and must defer to that resolution. *Wright v. West*, 505 U.S. 277, 296-97 (1992).

### 1.     Perjury

Petitioner contends that insufficient evidence supports her perjury conviction in Count I.  Amend. Pet. at p. 41.  Petitioner, unfortunately, neither addresses the elements of perjury under Michigan law nor provides any legal authority in support of her position.   Rather, petitioner makes the conclusory statements that "[t]here was no proof at trial that Robyn O'Non did not find a casing" and "[t]here was no evidence that Nick O'Non [petitioner's husband] and Robyn O'Non did not tell Matthew O'Non to buy tarps for use in the yard."  *Id.*

The perjury statute, M.C.L. § 750.422 provides as follows:

> Any person who, being lawfully required to depose the truth in any proceeding in a court of justice, shall commit perjury shall be guilty of a felony, punishable, if such perjury was committed on the trial of an indictment for a capital crime, by imprisonment in the state prison for life, or any term of years, and if

committed in any other case, by imprisonment in the state prison for not more than 15 years.

M.C.L. § 750.423 defines perjury, stating:

> Any person authorized by any statute of this state to take an oath, or any person of whom an oath shall be required by law, who shall wilfully swear falsely, in regard to any matter or thing, respecting which such oath is authorized or required, shall be guilty of perjury, a felony, punishable by imprisonment in the state prison not more than 15 years.

See People v. Robinson, 473 Mich. 878, 880, 701 N.W.2d 742 (2005) (pointing out that M.C.L. § 750.423 defines perjury punishable under M.C.L. § 750.422).

"The law is well established that to sustain a conviction for perjury the prosecution must prove the falsity of the statement made by the defendant." People v. Cash, 388 Mich. 153, 162, 200 N.W.2d 83 (1972). To prove the falsity of the defendant's statement, the prosecution must "establish[] the truth of its contradiction." Id. It is not enough for the prosecution simply to contradict the defendant's statement. Id. Rather, "evidence of the truth of the contradiction must come from evidence of circumstances bringing strong corroboration of the contradiction." Id.

The trial court denied petitioner's motion for a directed verdict on the perjury charge as follows:

> To support a conviction for perjury the evidence may be of corroborating circumstances but the corroboration must be of strong character and contradict in positive terms the statements of the accused.
>
> There are three generic areas that the Court has identified that it may potentially instruct upon. The first was the events of the 14th [i.e., May 14, 2004], where in summary, it is the Court's understanding from the defendants [sic] testimony in the prior proceeding that she spent a full day gardening, painting, preparing the cottage for renters. There is evidence in the record which would suggest that she worked until 4 p.m. that day, that there was some amount of rain, that there were no fresh plants, and that there was no evidence of painting or the smell of painting when the police reported to the scene and were present on the 16th, I believe through the 18th. Again, it is not for the Court to assess the evidence, to

weigh it to determine credibility, but there is evidence of a positive nature of a strong character which would suggest that the statement of working a full day on the 14th doing gardening, painting and preparing for renters was not entirely true.

With respect to the testimony regarding ropes and tarps, Ms. Drow testified that the defendant bought them, that they were in her car, the bodies were wrapped in them. There was additional evidence through photographs of that fact that there was a discussion prior to the shootings which related to Matthew O'Non's premeditation as to whether the tarps -- not the tarps, but whether the bodies -- whether the best way to commit a murder was to sink the bodies or bury the bodies or burn the bodies and there is evidence bodies were ultimately buried after having been wrapped in tarps and secured by rope. The defendant's allege [sic] the defending [sic] remark during trial was testimony was [sic] she told Matt to buy them, this could be a happy coincidence or it is consistent with the People's theory of an effort to refute the element of premeditation. Again, there is positive evidence of a strong character that would corroborate the determination to buy ropes and tarps well in advance of the shootings for purposes of burying the bodies. Ms. Drow testified that they were laid out, that the gun was ready and that she attempted to talk him out of the shooting, he told her to go into her room and went out and did this anyway.

With regard to the shell casing, there is significant evidence in this record that the defense of self-defense was false. There were no victim shots, there were no victim guns. There is evidence of pre-planning. There is no evidence of bullet strikes on the house or in the trees surrounding the house. Certainly the People offered evidence that they had exhaustively searched the area, none were found. The crime scene evidence was grossly inconsistent with the defendant's story, that defendant Matthew O'Non's story and Matthew O'Non's testimony as read into this record of making kill shots while on the run, all of the shots going through a driver side window but not hitting any of the other part of the vehicle and yet testifying that he fired many more shots than what actually hit the victims is a story that was strongly lacking in credibility.

The testimony of the defendant in this trial was that she found, two days earlier, a shell casing for a pistol, which she threw away. Now, clearly the mother of Matthew O'Non, this defendant, doesn't have an affirmative obligation to come forward and attempt to convict her son of murder. She also has no right to deceive or mislead those who are asking her questions regarding the murders. The defendant in this case testified that she was aware of her son's concern for her own safety, not necessarily his due to dangerous Mexicans being in the area. She was aware that she had found a casing, yet made no mention of it at any time to law enforcement prior to the trial. She knew her son at the time of her interview with the FBI was on the run, that bodies had been discovered on her property and that they were Mexicans, maybe not necessarily the same Mexicans but certainly one would anticipate some

23

logical connection having been made between these bodies and the warning provided to her, the People are entitled to a logical inference of a false story to lend some physical evidence of credibility to the theory of self-defense, the defendant herself does not need to mention the words.  There is an inference from evidence in this record that she was at the meeting at Mr. Elhart's office where Ms. Drow's theories were discussed.  There is certainly an inference she had knowledge of her son's theory of self-defense and her offering of this testimony does have sufficient evidence in the record of this trial that would support a conviction for perjury were the jury to return one. . .

Trial Trans. IV at pp. 38-41.

Petitioner's testimony at Matthew O'Non's murder trial included the following excerpts which are relevant to this case.[3]  Petitioner testified that sometime in April 2004 Matthew O'Non told her that "there are some bad men, they're Hispanic" and that "[i]f they come to the house, you have got to call the police right away."  Robyn O'Non testimony at p. 39.  Petitioner testified that prior to May 16th, "I was repainting inside the cottage, I was doing yard work, I was planting flowers."  *Id.* at p. 40.  Petitioner testified that she repainted one bedroom between May 1st (the date of the murders) and May 17th.  *Id.* at pp. 41-42.  She also testified that on Friday, May 14th (two days before law enforcement personnel searched the property) she spent a full day at the cottage planting flowers, watering things and picking up stuff in the yard.  *Id.* at p. 45.  It was on the latter date that plaintiff testified she found the shell casing and threw it away.  *Id.* at p. 72.

The trial court gave the following jury instruction for the charge of perjury, which involved petitioner's statements about the tarps and the shell casing:

---

[3] Although petitioner's testimony at her son's trial was indispensable in determining perjury, that testimony was not transcribed into the trial transcript, but rather admitted as an exhibit.  Trial Trans. III at p. 90.  This testimony is in the court record, however, appearing as Exhibit C to the prosecutor's response to petitioner's application for leave to appeal to the Michigan Supreme Court.  *See* Plaintiff's Response at Exh. C, Robyn O'Non trial testimony (docket no. 27).

24

Now, in Count I, the defendant is charged with the crime of perjury in a Court proceeding involving a capital case.  And, to prove this charge the prosecutor must prove each of the following elements beyond a reasonable doubt:

First, that the defendant was legally required to take an oath in a capital proceeding in a Court of Justice.

Second, that the defendant took that oath.  An oath is a solemn promise to tell the truth.

Third, that while under oath the defendant made false statements.  The statements that are alleged to have been made in this case are found beginning on Line Seven at Page 44 of Robyn O'Non's transcript continuing through Line Eight at Page 45 and again on Line 16 through 22 on Page 72.

I know you have copies of that transcript, but for your benefit I've been asked to read those in to the record for you.

Beginning on Line Seven at Page 44.

"Q.      And the tarps?

A.      The tarps came from us telling Matt to buy them.

Q.      Who's us telling Matt?

A.      His father and I.

Q.      Why would you want tarps?

A.      If you walk down to where our frontage was, we had wood chips down there and we had  b e e n hauling wood chips down there to make the ground walkable, it's somewhat mucky and we were filling it in with wood chips.  We were hauling a trailer full of wood chips to get it down there to spread it out.

Q.      How big is your trailer?

A.      It's the dimension of a sheet of plywood.  It holds one sheet of plywood, it's 4 x 10, maybe 4 x 8, I'm not positive.

25

> Q.     How big were these tarps, do you remember?
>
> A.     Matt called us to ask what size tarp to pick up, Nick gave him the dimension of the trailer so he would have told him what size the trailer was and what size tarp to get.
>
> Q.     When is it you thought you found this bullet casing?
>
> A.     Sunday.  I don't have May's calendar.  If May 16th was on a Sunday I was out there the Friday before, it was about a full day.  I was planting some of my flowers, watering things and that's when I was picking up stuff in the yard."

And, on Page 72:

> "Q.     All right, thank you very much.  Next, you indicated that you found the casing, can you tell us where you found the casing approximately?
>
> A.     The casing was at the edge of the driveway, the north edge of the driveway, it was almost where the grass was.  I was cleaning up in the yard, picking up some stuff, walking around."

Fourth, the defendant knew these statements were false when she made them. To sustain a charge of perjury, the prosecutor must prove the falsity of the defendant's statements.  Falsity is proved by establishing the truth of the contradiction.  The evidence may consist of corroborating circumstances, but the corroboration must be of a strong character and not merely corroborative in slight particulars and must contradict in positive terms the statements of the accused..

Trial Trans. V at pp. 70-73.

### a.  The tarps

Critical to any prosecution for perjury in Michigan is that the defendant make a false statement under oath.  The issue at Matt's trial was why Matt bought the tarps.[4]  The only testimony

---

[4]"At [Matt] O'Non's trial, [Petitioner] testified that she had instructed O'Non to purchase the tarps to help move woodchips around the cottage property, . . .. O'Non's testimony included his account of the killings and the circumstances surrounding and reason for his purchase of the tarps that were later used to

petitioner actually gave about the tarps at Matt's trial was that she and Matt's father told Matt to buy them.  Petitioner never testified that she told Matt why he should buy the tarps.  And, while one might come away from the exchange read to the jury by the trial jury in petitioner's trial  with the impression that she was going to use the tarps for wood chips, she never said that – she never made that statement under oath –  and therefore there was no statement of hers to that effect to prove false.

Precision is the hallmark of a perjury prosecution.  *See, generally, Bronston   v. United States,* 409 U.S. 752, 362 (1973) (". . . any special problems arising from the literally true but unresponsive answer are to be remedied through the 'questioner's acuity' and not by a federal perjury prosecution").  Viewing this evidence in the light most favorable to the prosecution, the court concludes that no rational trier of fact could find an essential element of the crime of perjury beyond a reasonable doubt, with respect to petitioner's statement regarding the tarps.  The jury was being asked to disbelieve petitioner's reason for asking Matt to buy the tarps, in favor of Matt's purpose of murder.  But in the absence of any explanatory statement by petitioner as to the reason for the purchase, a critical element of the perjury allegation is missing. While there may have been substantial evidence that O'Non intended to use the tarps to bury the murder victims, this evidence does not contradict petitioner's limited statement that she told O'Non to buy tarps.[5]

---

enwrap the victims' bodies.  Notably, his testimony was corroborated by and consistent with [Petitioner's] testimony that she had directed O'Non to purchase the tarps for yard work purposes.  This account contradicted plaintiff's theory that the tarps were purchased in preparation for the killings."  Michigan Court of Appeals summary of facts underlying perjury conviction, *supra* at p.2.  Indeed, at the outset of the trial, petitioner had been charged with conspiring to commit perjury, a charge the trial judge dismissed.

[5]Petitioner was also asked, "Why would you want tarps?"  She responded to that question with a plausible answer which, at most, alludes to the purpose of the tarps, but she never testified she told Matt to buy tarps for that purpose, or any other.

The assumption that petitioner told Matt to buy the tarps for yard use was not her testimony, and cannot be the basis of a perjury charge. Accordingly, there is insufficient evidence to convict petitioner of perjury with respect to her testimony concerning the tarps.

### b. Gardening on May 14th and the shell casing

It was also alleged in Count 1 that petitioner made several other false statements, to-wit: that she was gardening and cleaning up the grounds around her cottage on May 14th, and that during this time she found a bullet casing next to the driveway, which she threw away.

As previously explained, to prove these statements were false, it was not enough for the prosecution to simply contradict the petitioner's statements. The prosecution had to establish the truth of its contradiction from evidence of circumstances bringing strong corroboration of the contradiction. *People v. Cash, supra,* at 162.

The murders took place on May 1st and the bulk of the testimony against petitioner of any significance came from Kristin Drow, who testified as to events during the period from that date to May 16. Drow was the girlfriend of petitioner's son, Matt O'Non, who committed the murders. The victims were two other drug dealers to whom Matt owed money. He had not paid them for a 57-pound marijuana delivery. Trial Trans. Vol. II at 203.

Drow admitted to conspiring with Matt to murder the victims to avoid making payment, *id,* and to talking with Matt before the murders about how to dispose of the bodies.

Question:     And, what methods were discussed?

Drow:         Sinking them, burning them, burning them, burying them,
              I believe that was it.

Trial Trans. Vol. II. at 206. After they wrapped the bodies in the tarps, Matt wanted to sink the bodies in the water, but Drow suggested burying them instead, which they did. While Matt got a

28

shovel and buried the bodies, Drow smoked some marijuana.  Drow then assisted in helping to clean

up the murder scene by getting buckets of water to clean the blood off the driveway.  They then put

all the personal belongings of the victims into garbage bags and threw them away.  Trial Trans. Vol.

II at 213-214.  They had lunch in the kitchen, took a shower, had sex, and she went to work at her

job.  Before Drow left for her job, they ditched the victims' car in another location.  *Id.* at 214.  After

a couple of weeks, they fled downstate, but Matt left Drow in Lansing or Detroit and she returned

to Leelanau.  *Id.* at 216.

Drow admitted to facing three felonies carrying life sentences, and to testifying in

the present case in exchange for receiving a two to five-year sentence to a lesser offense of being

an accessory after the fact.  Trial Trans. Vol. III at 23.

Drow was repeatedly shown to be a liar:

First, she admitted lying to her "very good friend," Abby, the "only friend [she]

talked to and said anything to."  Trial Trans. Vol. III at 29.

Then she said she lied to her boyfriend's attorney.

| Question (by defense counsel): | And, then your testimony was that you had a meeting with Craig Elhart [defense counsel for Matthew O'Non] at his office? |
|---|---|
| Drow: | Yes. |
| Question: | Correct.  And you lied to him there? |
| Answer | Yes. |

Trial Trans. III at 48.

. . . .

Then she admitted to lying to everyone:

| | |
|---|---|
| Question (by defense counsel): | Isn't it true that – you not only lied -- excuse me, let me withdraw that.  We already established you admit lying to the police, lying to the FBI, lying to your friends, you lied to your parents too, didn't you? |
| Drow: | Yes. |
| Question: | Repeatedly? |
| Answer: | Yes. |

Trial Trans. Vol. III at 50.  Drow also admitted that at the time the murders were committed, she had recently gotten off probation for committing embezzlement, a crime of dishonesty.  Trial Trans. Vol. III at 51-52.

On cross-examination, Drow acknowledged that if she changed her testimony, she could be charged with the three life felonies.  Trial Trans. Vol. III at 51.

It was largely through Kristin Drow that the prosecution sought to discredit petitioner's testimony that during the two weeks between May 1st and May 14th, petitioner had been painting, cleaning and planting around her cottage in preparation for the summer renters.  Drow testified she had been spending time at the cottage off and on, and had not seen any signs of this being done.  If Drow could cast doubt on petitioner's veracity that petitioner had, among other things, done some painting at the cottage to get it ready for the renters,[6] the inference would be that petitioner would not have been spending time at the cottage and therefore would not have been in a position to find the bullet casing, or to discard it as unimportant.  While there were other pieces

---

[6]The Court notes petitioner was not charged with perjury about painting at the cottage.

of evidence from which the jury was invited to draw inferences in support of the prosecution's case, the lynch pin of the prosecution's case was Drow's testimony.

The prosecution tried to bolster Drow's testimony by pointing out that petitioner failed to tell an FBI agent about finding the bullet casing, when he was interviewing her about her son's whereabouts two days after the investigation began. Petitioner simply replied she had not been asked. The prosecutor also sought to suggest that since petitioner was at her son's attorney's office, she must have known he would raise a claim of self-defense, and from this assumption the jury could infer that petitioner falsely claimed to have found a bullet casing, to help that defense. It was circumstantial evidence of this nature from which the prosecution sought to bring "strong corroboration of the truth of the contradiction" of petitioner's statements.

There is sufficient evidence to support a conviction if, after viewing this evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia, supra.* I cannot recommend such a finding in this case.

The prosecution had to establish a "strong corroboration of the truth of the contradiction" of the petitioner's statements beyond a reasonable doubt. Even putting aside for the moment the dubious credibility of the prosecution's key witness generally, Drow's testimony about the periods of time she was at the cottage did not even necessarily conflict with that of petitioner; Drow's testimony reveals there were many times petitioner could have worked at the cottage when Drow would not have been there, by Drow's own admissions. Thus, Drow's statements certainly do not appear to rise to the level of 'strongly contradicting' petitioner.

Drow alternatively testified that she was at the cottage between five and six days during this critical two-week period, between May 1 and May 14, or eight to ten days, depending on who asked her.  Trial Trans. Vol. III at 26.  For example, on May 20, 2004, close in time to the events, Drow told police she had stayed at the cottage five to six days, but two years later at trial, she remembered it being eight to ten days.  Trial Trans. Vol. III. at 25-26.  Of course, she never identified which days.

Drow also testified she was away in the afternoons and evenings, at school, at her employment and at bars.

| Question (by defense counsel): | Were you in school at the time of these murders? |
|---|---|
| Drow: | Yes, I believe so. |
| Question: | Were you working? |
| Answer: | Yes. |
| Question: | You already testified you partied quite a bit, is that correct? |
| Answer: | Yes. |
| Question: | So, what was your school hours roughly? |
| Answer: | I believe I had school in the afternoon. |
| Question: | School in the afternoon, roughly what time? |
| Answer: | 12. |
| Question: | 12 o'clock you are in school.  What time do you go to work? |
| Answer: | 4.  I have to be there at 4. |
| Question: | What time to do you get off work? |
| Answer: | Between 9 and 11. |

| | |
|---|---|
| Question: | And, then you go out drinking with Matt? |
| Answer: | Mm-hmm.  Yes. |
| Question: | To about what time? |
| Answer: | 2.  Maybe later. |
| Question: | OK.  And, where would you go after that? |
| Answer: | Either to the cottage or my parents or his parents. |
| Question: | Do you recall telling – now, you testified at the trial in April 2005, roughly, is that correct, April 2005? |

MR. DONALDSON:          March.

BY MR. GUTSCHER:

| | |
|---|---|
| Question: | March, 2005.  Do you recall talking to the FBI in April 2005 about drug dealings in Leelanau County? |
| Answer: | Yes. |
| Question: | Do you recall telling them that you stayed mostly at your parents' house because it was closer to the place that Matt sold his drugs frequently? |
| Answer: | Yes and no.  I remember saying something to that, but I don't remember exactly what I said. |

Trial Trans. Vol. III, at 32-33.

By her own testimony, Drow was not at the cottage at all, 8 to 9 days, or 4 to 6 days, during this period, and even on the days she did stay at the cottage, she was not physically present up to 14 hours a day – all afternoon and evening – until returning from the bar.[7]  Thus, viewing the evidence in the light most favorable to the prosecution, it appears petitioner could have come to the

_____

[7] What condition Drow was in to observe the maintenance of the cottage, or whether she made mental notes about such things as she was falling into bed, such that she was truly able to testify about them several years later, was, of course, for the jury to determine.

cottage many days, and virtually any afternoon, and not have been seen by Drow.

Significantly, Drow admitted that petitioner was, in fact, often at the cottage, doing exactly what petitioner testified that she did:

| | |
|---|---|
| Question: | Now, the cottage on Putnam Road, do you ever recall telling your mother Robyn O'Non frequently worked out at the cottage? |
| Answer: | Yeah.  I mean, I told my mom that she cleans up out there and stuff. |
| Question: | Yeah. |
| Answer: | Yeah. |

Trial Trans. Vol. III at 26.

From this record, I cannot find the sufficiency of the evidence standard, applicable for review in a habeas proceeding, has been satisfied to establish that petitioner committed perjury when she testified, "if May 16th was a Sunday, I was out there the Friday before [May 14th], it was about a full day.  I was planting some of my flowers, watering things, and that's when I was picking up stuff in the yard."  If that cannot be proven, then the prosecution is left with only supposition to contradict petitioner's statement that she found a bullet casing.

### 2. Failure to properly instruct on the finding of perjury

There is, however, a second and separate problem unique with this issue, assuming, *arguendo,* there even is sufficient evidence to support the remaining allegations of perjury discussed in the preceding section.

Although this issue is labeled as being one of an "Insufficient Evidence of Perjury – Count I," petitioner arguably raised it as an instructional issue as well, since she specifically stated in her sub-heading as follows:

"Count I, the perjury charge **as instructed by the Judge** alleged the following testimony as false as given by Robyn O'Non at the murder trial of Matthew O'Non:[8] . . ." (emphasis added), and this is immediately followed by a **single** grouping by the court of three discrete allegations of perjury pertaining to (1) the tarps, (2) petitioner working on Friday, May 14th, and (3) petitioner finding a bullet casing.[9]  The jury was instructed on the general elements of perjury, and returned a single verdict of guilty to Count I.

Under the circumstances of this case as they developed, I find the grouping of all the perjury allegations into a single count, coupled with one generic perjury instruction, has resulted in a violation of petitioner's right to due process.  For the reasons set forth below, I am constrained to recommend petitioner's conviction on this charge be reversed.

A claim that a trial court gave an improper jury instruction is not cognizable on habeas review unless it is shown that the erroneous instruction "so infected the entire trial that the resulting conviction violates due process."  *Henderson v. Kibbe,* 431 U.S. 145, 155 (1977).  *See also Estelle v. McGuire,* 502 U.S. 62, 75 (1991) (erroneous jury instructions may not serve as the basis for habeas relief unless they have "so infused the trial with unfairness as to deny due process of law"); *Sanders v. Freeman,* 221 F.3d 846, 860 (6th Cir. 2000) (same).  If Petitioner fails to meet this burden, he fails to show that the jury instructions as given were contrary to federal law.  *Id.*

The jurors were never instructed that they had to unanimously agree beyond a reasonable doubt that all three of the statements petitioner was charged with making were, in fact,

---

[8]It was the trial court that identified the "three generic areas" of possible perjury it would ultimately instruct upon.  Trial Trans. Vol. IV at 38.

[9]This was also the way the issue was framed in the state courts.

35

false, or that if they only found some of the statements in Count 1 were proven to be false beyond

a reasonable doubt, they had to unanimously agree as to the same statements.

> An appropriate instruction in this instance, had it been requested, would have been

the following one, taken from *United States v. Fawley,* 137 F.3d 458, 470 (7th Cir.1998), which

concisely explains the rule and how it is to be applied:

> Count 1 contains answers given by the defendant reciting more than one fact.  It is
> not necessary that the government prove that each of these factual statements is false.
> The government satisfies its burden of proving falsity if it proves beyond a
> reasonable doubt that any of the factual statements recited in Count 1 is false.
> However, and this is important, *you must not find the defendant guilty unless you all
> agree, unanimously, that one particular answer is false.  It is not enough that you all
> believe that some answer given by defendant is false.  That is, you cannot find the
> defendant guilty if some of you think that only Answer A is false and the rest of you
> think that only answer B is false.  There must be at least one specific answer that all
> of you believe is false in order to convict the defendant.*

(emphasis in the original)

> In reversing a perjury conviction for failing to give this instruction, the Seventh

Circuit noted that:

> "[c]ase law is clear that a unanimous jury verdict is essential for
> conviction in any criminal case, whether it be federal or state."

*Id.* at 472.  The Fawley court concluded that the trial court in that case, which had attempted to give

a lesser version of this same instruction, had violated Fawley's due process rights by giving an

ambiguous instruction, and stated that "the defendant had a right to a unanimous verdict, and that

right was neglected here," holding that the defendant was denied his due process rights.  *Id.*

> One court has recognized a possible escape hatch, where, as in the present case, such

an instruction was not given, but also where the instruction had not been requested.  In *United States

v. Pagan-Santini,* 451 F.3d 258 (1st Cir. 2006), the court analyzed such a situation:

The government, as it did here, sometimes charges multiple perjuries under a single count. [FN2]  One might think either that this renders the count duplicitous, or at least that the jury would have to be told that all jurors must agree that one specific perjury had been proved.  At least two courts of appeals have required a "specific unanimity" instruction along the lines of the latter suggestion when a defendant requested it at trial.  *See United States v. Fawley*, 137 F.3d 458, 470-72 (7th Cir.1998); *United States v. Holley*, 942 F.2d 916, 925-29 (5th Cir.1991).

Nevertheless, the law is less clear than it might be as to when juror unanimity is required in the face of alternative paths to a verdict.  *See Richardson v. United States*, 526 U.S. 813, 817-24, 119 S.Ct. 1707, 143 L.Ed.2d 985 (1999); *Schad v. Arizona*, 501 U.S. 624, 630-45, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991) (plurality opinion); *United States v. Verrecchia*, 196 F.3d 294, 297–301 (1st Cir.1999).  Within a single count there may be alternative theories, alternative factual scenarios, and alternative lines of evidentiary inference, making generalizations about unanimity hazardous.

In this case, Pagán concededly did not seek a unanimity instruction in the district court and we do not find plain error.  *See United States v. Gomez*, 255 F.3d 31, 37 (1st Cir.2001).  **The evidence was adequate** (even if not overwhelming) **as to the perjurious character of all three statements;** and Pagán cannot show that omitting the instruction probably changed the result nor is there anything close to a miscarriage of justice.  *United States v. Olano*, 507 U.S. 725, 736-37, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). [emphasis added]

[FN2. *See, e.g., United States v. Bonacorsa*, 528 F.2d 1218, 1221–22 (2d Cir.) (citing Fed.R.Crim.P. 7(c)), *cert. denied*, 426 U.S. 935, 96 S.Ct. 2647, 49 L.Ed.2d 386 (1976); *United States v. Edmondson*, 410 F.2d 670, 674 n. 6 (5th Cir.), *cert. denied*, 396 U.S. 966, 90 S.Ct. 444, 24 L.Ed.2d 430 (1969).]

*United States v. Pagan-Santini*, 451 F.3d 258, 266-67 (1st Cir. 2006).

The rationale in *Pagan-Santini* is not applicable in the present case, since the predicate is missing.  Unlike *Pagan-Santini,* the evidence here was at best adequate "if not overwhelming" as to the perjurious character of only <u>two</u> of the three statements; as to the "tarp" statement, there was no showing of falsity whatsoever (as discussed in Section III.C.1.a., *supra*).  Thus, since some of the jurors may well have premised their guilty finding only on the tarp statement, and the prosecution cannot show they did not, the absence of the instruction has resulted

in a denial of due process.  In the present case, an instruction of this nature was essential, not because a state court defendant has a constitutional right to a unanimous verdict generally,[10] but because a state court defendant's well known federal constitutional right to due process, as determined by the Supreme Court of the United States, has always "protect[ed] the accused against conviction except upon proof beyond a reasonable doubt **of every fact** necessary to constitute the crime with which he is charged."  *In Re Winship,* 397 U.S. at 604 (emphasis added).  Without a Fawley-type instruction in this instance, there can be no finding that every predicate fact (i.e., a perjurious statement) necessary to a conviction has been proven (i.e., found by the jury).[11]  Such a conviction is contrary to clearly established federal law, as determined by the Supreme Court.  28 U.S.C. § 2254(d).  Thus, the absence here of a Fawley-type explanation so infused the trial on Count 1 with unfairness that it denied petitioner due process.

---

[10]A state criminal defendant, at least in non-capital cases, apparently has no federal right to a unanimous jury verdict, *see Johnson v. Louisiana,* 406 U.S. 356 (1972), and *Apodaca v. Oregon,* 406 U.S. 404 (1972); *see also discussion generally in Schad v. Arizona,* 501 U.S. 624 (1991).  The trial judge described the present case as a charge "of perjury in a Court proceeding involving a capital case."  *Supra* at p. 25.

[11]Under the instruction as given at trial (a *Pagan-Santini* situation), jurors could have found petitioner guilty if they found she had lied about something, even if they did not agree as to which one of the three statements was false.  A *Fawley* instruction, by contrast, requires the jurors to agree on which statement is false.  Since a state criminal defendant is involved, in the absence of any clearly-established Supreme Court law requiring a unanimous finding of a factual predicate, it appears that the *Pagan-Santini* instruction would pass federal constitutional muster, and the *Fawley* instruction would not be mandated under normal circumstances.  *See* 28 U.S.C. § 2254(d).

But that all changes if it turns out there is no evidentiary basis for finding one of the three statements to be false.  Even if the Supreme Court does not require jurors to agree upon which false statements serve as the factual predicate for a perjury conviction, it does require the jury to find beyond any reasonable doubt, some false statement as a predicate.  This is the fact necessary to constitute the crime of perjury, long spoken of by In Re Winship, and required for a conviction.  Here, the jurors could have selected any one of three statements as false, and without a *Fawley*-type instruction, we cannot know which one they picked.  Since one of those statements was not false, there is possibly a one out of three chance the facts as found by any juror were not sufficient to constitute the crime with which petitioner is charged.  This does not constitute proof beyond a reasonable doubt.

Accordingly, I respectfully recommend the conviction of perjury (Count 1) be set aside.

### 3.    Witness tampering

Petitioner contends that there is no testimony to support the claim that she obstructed, or planned to obstruct, Judd's ability to attend, testify, or provide information.  In *People v. Greene*, 255 Mich. App 426; 661 NW2d 616 (2003), the Michigan Court of Appeals discussed the wide range of activities which constitute criminal conduct under the various subsections of the witness tampering statute, M.C.L. § 750.122:

> The unifying theme among these subsections is an attempt to identify and criminalize the many ways individuals can prevent or attempt to prevent a witness from appearing and providing truthful information in some sort of official proceeding, as defined in subsection 12(a) [i.e., "a proceeding heard before a legislative, judicial, administrative, or other governmental agency or official authorized to hear evidence under oath"].   In the most general sense, the Legislature identified four different categories of witness tampering: bribery (subsection 1), threats or intimidation (subsection 3), interference (subsection 6), and retaliation (subsection 8).  That the Legislature chose *not* to place all these different types of tampering in the same subsection suggests that the Legislature considered them to be distinct.

*Greene*, 255 Mich. App at 438 (emphasis in original).

That portion of the witness tampering statute at issue in this case, M.C.L. § 750.122(6), provides as follows:

> A person shall not willfully impede, interfere with, prevent, or obstruct or attempt to willfully impede, interfere with, prevent, or obstruct the ability of a witness to attend, testify, or provide information in or for a present or future official proceeding.

M.C.L. § 750.122(6).

During petitioner's trial, Justin Judd gave the following testimony.  In the summer of 2004, arrangements were made for Matthew O'Non to stay with Judd in Glendale, Arizona.  Trial

Trans. III at pp. 100-01 (docket no. 22).  Matthew O'Non arrived via Greyhound bus and Judd

picked him up at the bus station.  *Id.* at p. 101.  O'Non stayed with Judd for about six weeks to two

months, until the FBI came and arrested him.  *Id.* at p. 102.  When the FBI questioned Judd about

O'Non's case, Judd told them "I didn't know anything."  *Id.* at p. 103.  Judd admitted that he lied

to the FBI and provided the following explanation.  *Id.*  After O'Non arrived at Judd's residence

in Arizona, he told Judd about the murders, including "where he shot them, how he shot them."  *Id.*

at pp. 103-04.  Judd testified that he had reached an agreement with Matthew O'Non to say that he

"didn't know anything" so that Judd would not be involved with the investigation.  *Id.* at p. 105.

Judd spoke with the Michigan State Police sometime before January 2005, and consistent with his

agreement with O'Non told the State Police that he "didn't know anything."  *Id.* at 105-06.  Judd

admitted that his statement to the Michigan State Police was not truthful.  *Id.* at p. 106.

　　　　In January 2005, Judd was arrested in Arizona and placed in the Maricopa County

Jail on an arrest warrant from Michigan.  *Id.*  While at the jail, Judd had visitation rights and was

visited by his grandfather and his girlfriend.  *Id.* at pp. 106-07.  The day before he left for Michigan,

petitioner and Nick O'Non, came to visit him in the jail.  *Id.* at 107.  Judd was aware that Matthew

O'Non's parents would be coming to Arizona to pick up their son's belongings.  *Id.* at pp. 107-08.

Judd, however, was not expecting a visit from the O'Non family at the jail.  *Id.* at pp. 107-08.

　　　　Judd met with O'Non's parents for about one-half hour while they sat together at a

table in a large room.  *Id.* at pp. 108-09.  Although Judd was shackled to the table, he was able to

freely converse with them.  *Id.*  Judd made about six efforts to speak with them about the case.  *Id.*

at p. 109.  However, when he tried to talk to them about the case, petitioner told Judd "[w]e know

you don't know anything." *Id.* at pp. 109-10.  The prosecutor then asked Judd how he interpreted his conversation with petitioner:

> Q.    In your mind what did you interpret, you don't know anything, to mean?
>
> A.    Keep doing what you're doing, don't say anything.  That's -- that's what I -- after saying we don't  -- we know you don't know anything that many times I understood the meaning perfectly, it was, you know, don't say anything.
>
> Q.    Don't say anything to whom?
>
> A.    To the police.  Keep doing what I had been doing.
>
> Q.    You took it to mean that she did not want you to talk to the police?
>
> A.    Correct.
>
> Q.    What did she said [sic] -- not what Matt told her, but what did she say?
>
> A.    She said that Matt had finally told her about everything.

*Id.* at pp. 110-11.  The Court overruled defense counsel's objection that Judd's testimony regarding what Matthew O'Non told petitioner was hearsay, stating "[t]hat answer if admitted by the Court would be against the penal interest of Matthew O'Non, would tend to incriminate this defendant and can be received under the analysis we discussed earlier this morning and the Court would receive it." *Id.* at p. 111.

After this colloquy, the prosecutor elicited the following testimony from Judd:

> Q.    Did Mrs. O'Non tell you what Matt said?
>
> A.    Yes.  Matt said -- she said Matt had told her the truth about everything.

*Id.* at p. 111.  Judd further testified that when he was brought back to Michigan he was charged with obstruction of justice, but ultimately convicted of a misdemeanor of attempted altering of a state ID.

*Id.* at pp. 112-13.  Under the terms of a plea agreement, Judd pled guilty and agreed to "give truthful testimony for every trial that there was going to be."  *Id.* at p. 113.

On cross-examination, when petitioner's counsel asked Judd "[t]hey never told you, they or Robyn, never told you ever to keep doing what you're doing, correct, those words never were uttered?" Judd responded "[n]o. those words were never uttered."  *Id.* at p. 115.  When asked "[d]id Robyn ever tell you not to talk to the police?" Judd stated "[n]o, it was obvious."  *Id.*  Judd re-iterated that petitioner did not tell him "please don't talk to the police," and that he was never asked, and did not testify about the jail conversations, at Matthew O'Non's trial.  *Id.* at pp. 116-17.  Judd admitted that neither petitioner nor her husband threatened him or offered him "a large sum of money to come to Court and to lie."  *Id.* at p. 121.

On re-direct examination, Judd explained his interpretation of his conversation with petitioner:

Q.      Explain what it meant to you.

A.      It meant to keep saying what I was saying, which was I didn't know anything and that I didn't know about any details about the murder or anything that Matt had done.

Q.      What would your interpretation be as to coming to Court to testify in relation to that statement?

A.      Again, play dumb.

*Id.* at p. 123.

The prosecutor then asked Judd to clarify his statement for the jury:

Q.      And, I'm interlaying the previous statement you made, it was obvious, you explain to the jury what was obvious.  What was your interpretation about you testifying in relation to that statement?

42

The trial court, over defense counsel's objection, instructed Judd to answer the question if he could.

In response, Judd testified:

> A.    Okay.  That it was, to my understanding, to not say anything , to keep doing what I was doing, which was not telling the truth, that was my interpretation.

*Id.* at pp. 123-24.

The trial court denied petitioner's motion for a directed verdict with respect to the charges of witness tampering (Count III) and conspiracy to commit witness tampering (Count IV), stating as follows:

> With regards to Count III [and] IV, there was testimony from Mr. Judd that the defendant disclosed to him that Matt had told her everything.  Certainly the defense is free to argue either that can't be believed or everything was a theory of self-defense, but Mr. Judd although he wasn't allowed to repeat what Matthew told him with regard to everything he viewed it as incriminating and he was directed not to say he knew anything and that the repetition of you don't know anything made it clear to him that he was not to say anything.  When one looks then at the elements of tampering with the witness it had been described in prior opinions of this Court, the Court believes within this record, there are pieces of evidence, if accepted by the jury as credible and if weighed would support a conviction of tampering with a witness and conspiracy to tamper with a witness beyond a reasonable doubt.  It is for the jury to weigh and assess that evidence, not for the Court.  And, so as to the counts relating to tampering with a witness, conspiracy to tamper with a witness and perjury the Court is denying the motion for directed verdict.

Trial Trans. IV at pp. 43-44.

Consistent with its ruling, the trial court gave the following jury instruction for the charge of witness tampering:

> Count III is a charge of witness tampering.  The defendant is charged with the crime of witness tampering.  To prove this charge the prosecutor must prove each of the following elements beyond a reasonable doubt:
>
> First, the defendant attempted to willfully impede, interfere with, prevent, or obstruct the ability of Justin Judd to attend, testify, or provide information in the Leelanau County trial of People versus Matthew O'Non.

> And, second, the defendant had knowledge or reason to know that Justin Judd could be a witness at any official proceeding involving the People versus Matthew O'Non.

Trial Trans. V at p. 73. The trial court also instructed the jury on the charge that petitioner was engaged in a conspiracy to tamper with a witness. *Id.* at pp. 73-77.

The Michigan Court of Appeals has stated that the terms used in M.C.L. § 750.122(6), i.e., willful, impede, interfere, prevent and obstruct "are sufficiently specific terms with commonly understood meanings." *People v. Barnett*, No. 295845, 2011 WL 1687631 at *5 (Mich. App. May 3, 2011). Here, petitioner's conduct with Judd at the Maricopa County Jail was not merely speaking with a witness as she suggests, but rather an attempt to interfere or influence Judd's conduct or testimony. Judd was an important witness who sheltered Matthew O'Non and to whom he admitted how he committed the murders. *Id.* at pp. 103-04. Even if petitioner did not know exactly what O'Non told Judd, her actions constituted a deliberate attempt to interfere with Judd's conduct. While there appears to be no evidence that petitioner physically prevented Judd from acting as a witness in Matthew O'Non's trial, there is evidence that she willfully impeded, interfered with or obstructed "the ability of [Judd] to attend, testify, or provide information in or for a present or future official proceeding." *See* M.C.L. § 750.122(6). One definition of the word "impede" includes "to hinder," which in turn is defined as "to cause delay, interruption or difficulty in." *The Random House Dictionary of the English Language* 672 and 714 (unabridged edition 1973). Definitions of the term "interfere" include "to take part in the affairs of others; meddle." *Id.* at p. 741. Finally, definitions of "obstruct" include "to interrupt, hinder, or oppose the passage, progress, course, etc., of." *Id.* at p. 995.

The record established that petitioner traveled from Michigan to Arizona, where she spent one-half hour sitting at a table with Judd at the Maricopa County Jail shortly before Judd was sent to the authorities in Michigan.  At this point in time, petitioner knew or had a reason to know, that Judd, a person Matthew O'Non lived with after fleeing Michigan, could be a witness at a legal proceeding or trial related to the murder.  A jury could infer that petitioner was interfering with Judd's potential testimony by the fact that she traveled to Arizona and met with Judd at the jail, by encouraging him to "play dumb," i.e., not to testify truthfully at trial.  Viewed in the light most favorable to the prosecution, a rational trier of fact could find beyond a reasonable doubt that petitioner's meeting with Judd in the Maricopa County Jail, where she repeatedly told Judd that "we know you don't know anything," (statements which Judd interpreted as meaning that he should continue "playing dumb" about matters disclosed to him by Matthew O'Non), was sufficient evidence to establish that petitioner impeded, interfered, obstructed or hindered Judd's ability to testify or provide information for Matthew O'Non's upcoming murder trial contrary to M.C.L. § 740.122(6).  Accordingly, petitioner's claim should be denied.

### D.      Prejudicial testimony from Justin Judd

Petitioner contends that certain testimony given by Justin Judd was inadmissible and prejudicial.  Specifically, petitioner points to some of the testimony which Judd gave over defense counsel's objection:

Q:      Did she [petitioner] tell you if she had any conversations with Matt?

A:      Yes.

Q:      What did she said -- not what Matt told her, but what did she say?

A:      She said Matt had finally told her about everything.

45

Trial Trans. III at p. 111 (emphasis added).  *See* Amend. Pet. at p. 42.

When defense counsel objected to this statement as hearsay, the Court ruled as follows:

> That answer if admitted by the Court would be against the penal interest of Matthew O'Non, would tend to incriminate this defendant and can be received under the analysis we discussed earlier this morning and the Court would receive it.

Trial Trans. III at p. 111.  By way of background, earlier in the day the Court discussed its ruling that Matthew O'Non's statements were admissible:

> In light of the rules of evidence and Michigan criminal law and criminal procedure, the Court does reiterate its finding that the simplistic analysis that 801(D)(2)(a) makes Mr. O'Non's statements hearsay is error; however, statements made against penal interest by Mr. O'Non, 801(D)(2)(a) statements, the beginning of the analysis is they also have to be made spontaneously and with the tendency to incriminate without showing some sort of motive or intent to implicate this defendant they do become admissible.

*Id.* at pp. 3-4.

Petitioner contends that this testimony was improperly admitted under state law, because the statement was not against the penal interest of Matthew O'Non (a non-party to the case) and that the probative value of the testimony was "nil" while the prejudice of connecting petitioner with Matthew O'Non through a conversation was "enormous."  Amend. Pet. at pp. 42-43.  Petitioner has raised an issue of admissibility of this evidence under state law, contending that "[t]he potential of misleading the jury connecting [petitioner] to the illegal acts of Matthew O'Non and Justin Judd is enormous, deflecting the jury from the actual testimony regarding the charges" and that the evidence was not admissible under MRE 801 ("Hearsay; Definitions"), because the statements did not fall within the strict requirement of that rule.  *Id.*.  In addition, petitioner makes a cryptic reference to the Confrontation Clause, i.e., "[s]tatements against penal interests do not constitute a firmly rooted exception for purposes of confrontation analysis."

Petitioner raised this issue in her delayed application for leave to appeal to the Michigan Court of Appeals.  On appeal, the state appellate court found no error of state law in admitting Judd's testimony, denying the leave to appeal for "lack of merit" in the grounds presented. *Faye Robyn O'Non*, No. 280262 (April 4, 2008).  Federal habeas review is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.  *Estelle v. McGuire*, 502 U.S. 62, 68 (1991).  "[F]ederal habeas corpus relief does not lie for errors of State law." *Id.* at 67, *quoting Lewis v. Jeffers*, 497 U.S. 764, 780 (1990).  The state courts are the ultimate expositors of state law in federal habeas proceedings.  *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975).  Here, the state appellate courts found no error of state law.  "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle*, 502 U.S. at 67-68.  A state court's ruling on evidence, standing alone, "is simply not cognizable on habeas review."  *Bey v. Bagley*, 500 F.3d 514, 519 (6th Cir. 2007).

With respect to the Confrontation Clause claim, petitioner cites *Lilly v. Virginia*, 527 U.S. 116 (1999) for the proposition that "[s]tatements against penal interests do not constitute a firmly rooted exception for purposes of confrontation analysis."  Petition at p. 43.  Petitioner apparently contends that the hearsay exception relied upon by the trial court, MRE 801(D)(2)(a), is constitutionally infirm.  Petitioner, however, does not develop this cursory argument.  Similarly, while petitioner cites *Gravely v. Mills*, 87 F.3d 779 (6th Cir. 1996) and "U.S. Const. Amends. V, VI and XIV," she fails to develop a federal constitutional argument with respect to this evidentiary issue.  "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in

47

a most skeletal way, leaving the court to . . . put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d

989, 995-96 (6th Cir. 1997).  Accordingly, the court deems this argument waived.

> **E.  Evidence of buried marijuana and burned letters from the victims was inadmissible**

Petitioner contends that she is entitled to a new trial because the trial court

erroneously admitted evidence of four pounds of marijuana buried at the cottage on Putnam Road

(the "Putnam Cottage") and of partially burned letters from the victims found at a fire pit at the

cottage.  In support of this claim, petitioner states that the bodies of the victims murdered by

petitioner' s son were found on the site of a rental cottage owned by petitioner and her husband,

Nick O'Non, that there was a search of the grounds around the cottage "and lots of testimony about

it."  Amend. Pet. at p. 45.  Petitioner states that a major issue within the perjury charge was

petitioner's testimony that she found a shell casing in the yard  of the cottage. *Id.*

Petitioner contends that the government's introduction of this evidence requires a new

trial.  She states her claim as follows:   "In Matthew O'Non's trial, petitioner testified that after the

shooting, she found a shell casing in the Putnam cottage yard  which was larger in caliber than a .22

round, that she did not think it was significant, and that police testified that thereafter following May

16, 2004 when the bodies were found, 15-20 officers had searched the property and had not found

any evidence of incoming fire from the dead men."  Amend.  Pet. at p. 45.[12]

Based on this time line, petitioner presents the following argument:

> Here, testimony about a thorough search of the yard advanced the
> prosecutor's case.  They had that in the testimony about the 15-20 officers searching
> the yard.

---

[12] Petitioner cites her statements as appearing in "Exhibit 9."  Amend. Pet. at p. 45.  The Court notes that there is no "Exhibit 9" attached to the petition.

> The idea that this marijuana and the burned letter had relevance to the charges in this case is sophistry. The prosecutor wanted the improper prejudice of marijuana and a dead man's writing to influence the jury.

*Id.*

At petitioner's trial, the government proposed to make an offer of proof to demonstrate that shortly after her son murdered the victims at the Putnam Cottage, petitioner had discovered two recent dig sites on the cottage property. The prosecutor stated:

> Your Honor, the request is only to allow the witness [i.e., petitioner] to testify that as a result of an extensive and exhaustive search of the property, that in addition to finding two shell casings, she also found two fresh dig sites in or around the property.

> The testimony of [petitioner] during the course of the trial of her son indicated that she had two days prior to the arrival of the police on the scene on the 16th, on the 14th had been engaged in the process of planting and watering flowers. The relevance is to establish that they did during this exhaustive search specifically concentrate and look for freshly unearthed areas of the property and indeed found freshly unearthed areas of the property. And, that, in essence, the testimony of [petitioner] regarding the flowers could not be true.

> I understand that the thrust of this trial is not to prove that she lied about planting flowers, Judge, but to prove that her testimony as a whole was designed to do two things. One, was to rebut the prosecution theories regarding an ambush and the premeditation. And, secondly, to support the defense's claim of self-defense. In order to support that theory she had to place herself on the premises and at the residence for a consistent and constant and long period of time over the course of days.

> She testified that between the 16th -- or, between the 1st of May and the 16th she was out there many, many times. She testified that Matt couldn't have possibly planned an ambush there because her comings and goings were unannounced and frequent and that she did a number of things while she was there. And, this evidence is just one piece of evidence to show she couldn't have been there.

Trial Trans. II at pp. 4-5.

Petitioner's counsel objected to the introduction of this evidence:

The first offer, I guess, is the dig site off the property, I don't think you can reasonably infer or impugn [petitioner] with knowledge of what occurred off the property. She was not on the property, she never offered any testimony she examined the neighboring property or was over in the pine trees.

Second, they want to offer some kind of evidence found at the bottom of a firepit, I don't believe [petitioner] ever offered any testimony she was out there digging in a firepit. Because the police did an extensive search and found some papers at the bottom of a firepit doesn't mean [petitioner] would have any knowledge of that or have any reason to dig in the firepit, it wasn't her testimony.

Therefore, neither one of those two pieces of evidence are relevant to this proceeding because they don't make the charge of perjury, the conspiracy to commit perjury, witness tampering or conspiracy to commit witness tampering more or less likely to have occurred. It simply confuses the issue, it's not probative and it doesn't serve any purpose to the elements of these charges.

The fact that there was a burial site on the property, of course, is evidence. But, whether there was paper at the bottom of a burn pit or whether there was a hole in someone else's property I just don't think is relevant to this proceeding.

*Id.* at pp. 6-7.

The trial court ruled that the prosecution could introduce the evidence for a limited

purpose:

What has made this case interesting to this point is you're both obviously bright and the brighter lawyers get the more arguments pass like ships in the night. There are salient points to both of your positions. [Defense Counsel Gutscher], beginning with you, the Court certainly agrees attributing evidence found in the fire pit, or the evidence discovered off site, the marijuana, to [petitioner] isn't relevant to these proceedings and the Court has ruled and stated that it's not relevant to these proceedings in the sense of showing conspiracy or witness tampering. The Court, however, understands the revised offer of proof is not intended to link this defendant with either the marijuana or the discoveries in the firepit but to show the exhaustive nature of the search. Now, the exhaustive nature of a search, if accepted by the jury, is materially relevant to the claim that a shell casing wasn't found, but yet the evidence was manufactured. The danger in the evidence, the 403 issue to avoid undue prejudice is how to present evidence of an exhaustive search that would included the discovery of the marijuana just off the property line and the things in the firepit without suggesting that somehow [petitioner] was responsible for either.

50

The solution to that, the Court believes, is again with an appropriate limiting instruction, I think in fairness as I made clear from the beginning that there is not an attempt here to attribute responsibility for the marijuana or the things in the firepit to [petitioner]; to the contrary, the sole purpose of offering this evidence is to establish that the police, law enforcement, if accepted by the jury, did engage in an exhaustive search, the findings of which were inconsistent with [petitioner's] testimony and in the original case, Matthew O'Non's theory of the case.  But, if this is to be done it has to be done with that very limited purpose.  And, if it's not clear in the way it's presented by the prosecutor, the Court will provide a limiting instruction.  I know at one time you did wish to attribute, at least some of this, to [petitioner] but the Court has ruled that's beyond the scope of the bind over.

*Id.* at pp. 7-8.

During petitioner's trial, Detective Mark Harris of the Michigan State Police testified

regarding the two pits.  *Id.* at pp. 79, 91-92.   When asked if there was "[a]ny other evidence of

things being buried in or around the property," Detective Harris testified:

> A.    Yeah.  You can kind of make it out on this photograph.  There is, I don't know if you are going to be able to see it or not, but there is over in this area between a couple of trees another burial site that we locate [sic].
>
> Q.    And, what was located in that burial site?
>
> A.    That burial site we located four pounds of marijuana.

*Id.* at p. 91.

When petitioner's counsel objected to this testimony, the Court advised the jury:

> Again, in a prior ruling the Court has indicated this is relevant but only to the issue associated with how thoroughly or not the crime scene was searched, there should be a clear understanding by the jury, there is no intent here or effort to relate the finding of this marijuana to any action taken by [petitioner].

*Id.*

When asked if there was anything else found buried in or around the cottage,

Detective Harris testified:

51

> A.    There was.  In the excavation of a small firepit which was located behind the cottage, there was some very small pieces of paperwork that had some Spanish writing on them, that was charred on the edges indicated it had been burned probably in that location.
>
> Q.    And, the information you had is that those were buried under some ashes, yet still discovered?
>
> A.    That's correct.

*Id.* at p. 92.

Immediately after Detective Harris gave this testimony, the trial court gave another instruction to the jury regarding the relevance of the testimony:

> Again, ladies and gentlemen this evidence is being received for the same purpose simply to show what efforts were made to search the scene [sic] there is no suggestion that [petitioner] burned Spanish language papers in the firepit.

*Id.*

As demonstrated by the trial court's instructions to the jury, the marijuana found buried on someone else's property, and remains of the letters found under ashes in a fire pit were admitted solely to demonstrate the exhaustive nature of the law enforcement officers' search of the land around the cottage.  The trial court cautioned the jury that petitioner was not connected to either the marijuana or the burned papers. The trial court's evidentiary ruling was not found as erroneous by the state appellate courts.  Petitioner's habeas issue is nothing more than an objection to the state trial court's ruling on the admissibility of this evidence. It is not a question of whether this court would have made a similar ruling.   Petitioner does not advance a federal constitutional basis to support her demand for a new trial.  Her disagreement with the state trial court's evidentiary ruling is not cognizable on federal habeas review.  *See Estelle*, 502 U.S. at 67-68.   Accordingly, petitioner's claim should be denied.

## IV.     Recommendation

For the reasons discussed, I respectfully recommend  that petitioner's conviction of perjury be **SET ASIDE,** and that in all other respects the habeas petition be **DENIED**.  Rule 8, Rules Governing § 2254 Cases in the United States District Courts.


Dated:  May 12, 2014                              /s/ Hugh W. Brenneman, Jr.
                                                  HUGH W. BRENNEMAN, JR.
                                                  United States Magistrate Judge


ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).